Matter of R.B.T. v D.D.T. (2005 NY Slip Op 50952(U))

[*1]

Matter of R.B.T. v D.D.T.

2005 NY Slip Op 50952(U)

Decided on February 14, 2005

Family Court, Westchester County

Edlitz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 14, 2005

Family Court, Westchester County
In the Matter of a Custody Proceeding under Article 6 of the Family Court Act R.B.T., , Petitioner/, Respondent
against
D.D.T., Respondent/Petitioner.
xxx

Sandra B. Edlitz, J.
The parties to this custody proceeding, Petitioner/Respondent, ("father") and Respondent/Petitioner, ("mother") were married in October 1993. There are three children of their marriage. The parties have been living separately since, November, 1998. The mother left the father and the marital residence and began living, along with the parties children, with another man ("second father") in or around July 1999. She bore his child in 2001. She left "the second father" in January 2004.[FN1]
[*2]
The parties have a long history in Family Court going back to June, 2000 when the father filed a petition requesting visitation. On December 15, 2000, an Order of Visitation was entered. On October 29, 2002, the father filed a violation petition stating that the mother was not producing the children for visits. On November 20, 2002, visitation was suspended after the mother alleged that the father had an alcohol abuse problem. On January 21, 2003, a Modified Order of Visitation was entered, whereby the father had supervised visits. The mother's allegation of alcohol abuse was not sustained. On June 24, 2003, the father's petition alleging violation of visitation was settled by a new order to once again allow unsupervised visits. On October 18, 2004, the father's visitation with the children was once again, suspended after the mother filed a Family Offense Petition which alleged inter alia that the father had an "ongoing alcohol problem". On November 16, 2004, the Family Offense Petition was dismissed with prejudice after a fact finding hearing was held.
On or about December 23, 2003, mother and father each filed a petition by Order to Show Cause pursuant to Article 6 of the Family Court Act, seeking custody of their minor children. The father appeared together with his attorney, and the Law Guardian appeared. On December 24, 2003, the mother appeared and reported to the Court that she retained counsel. The mother later discharged her retained attorney, and, at her request the Court assigned her an attorney ("First Assigned Counsel") on January 15, 2004. On the eve of trial, in or around, May, 2004, her First Assigned Counsel made application to be relieved due to a conflict with the mother. The mother consented. The Court urged her to reconsider. The Court reluctantly granted the application, advising the mother that her assigned counsel was highly competent. Her First Assigned Counsel was replaced by another assigned counsel ("Second Assigned Counsel"). The trial commenced on June 17, 2004. On November 1, 2004, after five days of trial, the Second Assigned Counsel filed an Order to Show Cause seeking to be relieved after the mother made it clear that she no longer wanted to have the Second Assigned Counsel represent her. The Court advised the mother that the Second Assigned Counsel was highly competent and had represented her zealously throughout the proceeding. The Court, to no avail, urged the mother to reconsider her consent that her attorney be relieved, the Court advised the mother that the Court would continue the hearing and would not assign her a third attorney. "While the state can guarantee ... meaningful representation, it cannot ensure a harmonious relationship between the litigants and their attorneys", People v. Linares, 2004 NY Lexis 1311 (Ct. App.). The mother insisted that the Second Assigned Attorney be relieved. The mother indicated she had sought out retained counsel, but new counsel never appeared. The mother went forward representing herself. The mother continued pro se for four sessions . She cross-examined one witness and made objections during testimony of the social worker and the father on December 7, 2003, wherein she left the courtroom in the middle of testimony. She did not return for subsequent sessions although duly notified by the Court verbally and in writing that if she failed to appear the matter would proceed in her absence.
Forensic evaluations were ordered on January 15, 2004 and received on June 7, 2004. The fact finding hearing commenced on June 17, 2004 and continued on July 13, July 14, September 9, October 4, November 16, November 17, December 1, December 6, December 7, [*3]2004, December 8, 2004 and concluded on January 6, 2005. At the conclusion of the hearing, the Court directed the submission of written summations and a Proposed Order of Custody and Visitation by January 25, 2005. The Court granted the mother extensions of time for post trial submission. On February 4, 2005, the mother submitted a Proposed Order of Custody. The Court has had a full opportunity to consider the evidence presented having heard the testimony, the in camera interviews of the children, and reviewed exhibits and post trial submissions. The Court has heard the testimony of: the second father, Superintendent of the children's school; the children's therapist, and the father.
On June 17, 2004, The Superintendent of Schools, Dr. B.D., was called by the father to testify. Dr. B.D. testified that his first contact with the mother was approximately two and a half years ago when he was speaking at a parent meeting and the mother was in the audience. Dr. B.D. testified that the mother was confrontational and heckled him, shouting out questions from the audience. According to Dr. B.D., at one point, the mother yelled "so how you gonna deal with that one, tough guy?" Dr. B.D. testified that in thirty-five years as an educator, he has never met a parent as critical as the mother. According to Dr. B.D., the mother's behavior with teachers and staff at the school was so bad that in December 2003, for the first time in his sixteen years as Superintendent of Schools, he banned the mother from the school and from contact with school personnel except in his presence. Dr. B. D. testified that his contact with the mother was regarding the middle girl exclusively although, the younger child also attended the school. Dr. B.D. testified that the middle girl was classified as a special education student and there was "ongoing difficulty" between the mother and the school staff. He had a variety of discussions with the mother during the 2002-2003 and 2003 -2004 school years with respect to which he described the mother's behavior as inappropriate and verbally abusive. Dr. B.D. testified that he had little contact with the father but the contact he did have with him was positive. The Court found his testimony credible.
 On July 13 and 14, 2004, the second father was called to testify by the father. The second father testified that the mother and the three subject children lived with him, and with his child after she was born, in his home from August 1999 to February 1, 2005. He testified that during the five years they lived together, the mother stole from her job, shoplifted from stores, and stole from the father by cashing his dental reimbursement and Internal Revenue Service refund checks. According to the second father, the mother denigrated the middle girl's teacher to the child. She removed the children from school when the school disagreed with her assessment of their educational needs and home schooled them for some months, but gave up the project. When questioned about the mother's parenting skills, the second father testified that there was no fixed bed time for the children. The children often slept on the couch in front of the television. He alleged that the mother has a history of "irrational behavior and verbal abuse and unjustifiably yells, screams and curses" at the children. The second father testified that the mother spoke negatively of the father to the subject children, and that she told the children to call him (the second father) "dad" stating to the children he was more of a father to them than their real father. She would tell the children that their father was "a loser, a no good drunk and he didn't care about them" and wasn't paying enough child support. During the course of the proceeding the [*4]father and the second father spent time together with the four children pursuant to court orders. The second father testified that the father was loving and caring towards his children and that he had never seen him drunk. The Court found his testimony credible.
On November 18, 2004, the children's therapist, was called by the father to testify. She has seen the children weekly for therapy since June, 2004. She testified that the boy is bonded primarily to the mother although he loved his father. The therapist testified that the girls' attachment is well distributed between the parents. The therapist spends the most time in therapy with the boy, who had the most issues to be resolved. The boy was born with cerebral palsy that affected the left side of his brain and body. His right arm is stayed at his chest. The boy is classified as "Other Health Impairment", and is in a self-contained special education classroom (known as MAC II). The boy receives adjunctive speech, occupational therapy, and physical therapy in school on a weekly basis. The therapist reported that the boy was resistant to visiting with his father although he could not articulate any reason except for the fact that his father's girlfriend distracted him from paying as much attention to the boy as he would have liked. She testified that there always seemed to be some problem with the boy when his father picked up the children but that things were fine after the boy and his father spent five or ten minutes together. The therapist testified that the children always seemed to have a good time with their father, that they did things together but also seemed to have a good time even when they stayed home. Initially, the visitation scheduled was weekly with the father and all three children. At some point, the visitation schedule was changed so that the girls visited with their father every weekend and the boy went every other weekend instead of all three children visiting every weekend. The girls encouraged their brother to come with them on the third visitation weekend, but he refused, giving no reason. The therapist testified that the children should be required to go with their father for visitation as they are too young to be empowered to make the decision not to go. The therapist did not believe that the change in the visitation schedule helped or harmed the children. She testified that her role was to promote the children's relationship with both of their parents and to keep them out of the fray. She believed that the children's biggest problem is their parents' animosity for each other. The therapist felt that the mother's biggest strength was her involvement. However, she felt that the mother worried too much about the little things and blew them up all out of proportion, would become agitated, and would transmit her agitation to her children. She found that the mother might precipitate a crisis looking for something to be concerned about. She specifically pointed to the mother's decision to hospitalize the middle girl at a children's psychiatric hospital, to which the mother brought the child for admission during the trial. The therapist did not believe psychiatric hospitalization for the child was necessary. In contrast, the therapist felt that the father's strengths are his willingness to listen to his children, his gentleness (particularly with the boy), his calmness and his steady demeanor. The therapist felt that both the mother and father are adequate custodial parents.
The father testified on his own behalf. He testified that in 1989, before he met his wife, he was charged with drinking while driving. He testified that he voluntarily stopped drinking in September 2002 and in February 2003, he entered an outpatient substance abuse program which he completed in June 2003. He has had increasing contact with the children's school and [*5]therapist and has taken a more active role in the children's lives as he has been afforded more contact with them. He has participated in the children's therapy and has indicated his willingness to continue to do so. The father has taken the initiative to confirm that his children will be able to continue at their current school until the end of the year. He has contacted the elementary school, which they would attend, if he were granted custody so that the school is aware that the children may be attending next year and that two of the children have special needs which will have to be addressed. He has made arrangements for after school care for the remainder of this school year and has the support of his family when help with the children is needed.
The Court ordered forensic evaluation was admitted into evidence. The report found that the father was quiet and reserved, rapport was easily established and that his account was consistent. He was deemed to be a reliable informant. The report found the mother to be a minimally reliable informant based on her inconsistencies, tendency toward omission, minimization and outright denial of relevant information as well as her limited insight as to her own behavior. The report concluded that the father demonstrated a strong commitment to maintaining his sobriety and presented no psychopathology that would preclude adequate care of his children. The report also found that the father could be an effective negotiator for the children's educational needs. The report found that the mother's parental capacity was of significant concern based on her "interpersonal and emotional difficulties, inappropriate suspiciousness, compulsivity, and anger-management issues". The report concluded that there "is strong potential for ongoing and chronic risk" to the children if they remain in her care without psychiatric and psychological intervention.
On or about July 13, 2004, the Court conducted an in camera with all three children, during which the Law Guardian was present. The Law Guardian reports that the children, ages 10, 9, and 7 wish to live with their mother. The boy, in particular, wants to live with his mother which is consistent with the forensic assessment regarding the boy's strong bond with his mother. The girls are less adamant in their desire to live with their mother, particularly the younger girl, who was primarily concerned with the change of school. Other than that concern, none of the children gave any reasons for preferring to live with their mother and they all seem to do well when with their father. It is the position of the Law Guardian and the Court agrees, that the children do not possess sufficient maturity and intelligence to make a determination as to what is in their best interest. The Law Guardian recommends that it is in the best interest of the children for custody to be awarded to their father and that the Order and visitation scheduled submitted by the father's attorney be adopted by the Court.
The mother, did not testify on her own behalf, or call any witnesses or admit documentary evidence; rather she chose to absent herself from a continued trial. The Court is aware that the mother has put time and effort into parenting her children. She has arranged for their after school activities, as well as their medical and dental needs. Throughout the children's early years, the mother was the primary caretaker of the children and she continues to remain sensitive to the developing social and educational needs of the children and an important part of their lives. The mother was supportive of her children's academic progress and actively participated in [*6]completion of homework assignments and other school-related assignments. To her credit, she attempted to advocate for her daughter when she believed that the child had some learning disabilities; however, she quickly "crossed the line between advocacy and abusiveness" and was eventually banned from the school and any communication with the teachers or staff. She did not sustain her home school project. During her interview with the forensic evaluator, she portrayed herself as being victimized by the school. She denied ever being abusive and reported she was never inappropriate in her dealings with the school. The mother has repeatedly alleged drinking by the father resulting in suspension of visitation or supervised visitation. This is not consistent with the testimony and credible evidence presented to the Court. His clean evaluation and reinstatement of visits would suggest that her allegations were at best thoughtless, and at worst, and probably, spiteful, and not in the children's interest.
The Court was in a unique position to evaluate the demeanor and credibility of the parties and witnesses. The Court finds that the mother has a dismissive and negative attitude towards the father. She disparages the father in front of the children. Her behavior is erratic and mercurial. She ranges from rational to irrational, from foul mouth to reasonable speaking. She is at times dishonest, excitable, impatient, angry and unable to control her emotions. At other times, she exhibits rational and controlled behavior. She was a relentless advocate for her children but she was inflexible and would not listen to the recommendations, believing and accepting only what she wants to hear. When she was unhappy with the school she took the children out and, apparently half-heartedly, home-schooled them for some months, only to give up the project. When she was not happy with the therapist, she stopped taking the children to her for therapy. When she was not happy with the Court, she stopped appearing. The Court finds that her mercurial behavior and her dishonesty and mean-spiritedness towards the father are significant and impair her parental capacity.
In complete contrast to the mother, the Court found the father to be of steady and even temperament. He was tolerant and flexible, considerate and honest. The father has enjoyed regular contact with his children and has grown as a parent. He has maintained contact with the children's schools and teachers, taken the initiative and sought out information from school personnel regarding meetings and conferences. He made efforts to alter his work schedule to be present for these events.

The mother contends that the father has a serious drinking problem. This is another example of her irrational and mean-spirited behavior. The father testified credibly that he voluntarily stopped drinking and has been sober since September 2002. This is supported by the fact that none of the numerous Court ordered tests has come back with a positive result. The father's sobriety is also supported by the Chemical Dependency Evaluation dated February 5, 2004. The evaluation noted that the father had been previously evaluated in December 2002, and there was a recommendation for treatment. The father subsequently, completed a program in 2003 and continues to participate with ongoing sponsored treatment on a consistent basis. It was noted that the father "is in active recovery and has a strong commitment to his recovery and continuing in treatment." At the time of the evaluation, the examiner concluded that there was [*7]"no need for further treatment".
The father continues to reside in the marital residence, which is a split level, three bedroom home situated on four acres. The father testified he sleeps in the master bedroom, the boy has his own room and the girls share a room. The father testified that he built fifty percent of the home himself. He added 1100 square feet for the children, including a playroom. He testified that he has worked at a steady job for many years, owned his own home and is capable of meeting the needs of the children, including meals, homework, educational needs and after-school activities. The father has been observed to have a strong and positive attachment with the three children. He testified that he is able and ready to provide for all the needs of the children. The Court finds that the father has the ability to properly parent, discipline and interact with the children. Accordingly, it is
ADJUDGED, that it is in the best interest of the children for custody to be awarded to their father.
The Court makes no visitation order at this time without prejudice to the mother filing an appropriate application.[FN2] Accordingly it is
ORDERED, that the custody petition by the father is granted; and it is further
ORDERED, that the father, shall have sole legal and physical custody of the children; and it is further
ORDERED, that the mother, shall have access to children's medical records and providers.
ORDERED, that the custody petition by the mother is dismissed.
ORDERED, that the father, shall make all efforts to assure that the children continue to attend the same school district, with him transporting the children daily, until the conclusion of the 2004-2005 school year; and it is further
ORDERED, that the mother shall have visitation as agreed between the parties, or as further ordered by this Court.
Footnotes

Footnote 1:The proceeding involving custody of the 4th child was originally a combined hearing with this proceeding. On October 4, 2004 the petition for custody of the second father was settled on consent with a joint custody order and the hearing for custody of that child abated. 

Footnote 2:On January 28, 2005, the father filed an Order to Show Cause ("OTSC") requesting sole temporary custody of the subject children. The father alleged that the mother was arrested and charged with endangering the welfare of minors, specifically, the three subject children. Attached to the OTSC was a temporary order of protection issued by criminal court against the mother in favor of the children, directing the mother to stay away from the children. The Court did not consider the arrest or allegations in making its decision regarding the issue of the mother's visitation for custody.